```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF LOUISIANA
                          MONROE DIVISION


UNITED STATES OF AMERICA,       :   DOCKET NO. 3:24-CR-00031

                 PLAINTIFF,     :

VERSUS                          :   August 26, 2024

                                :

ISAAC BRADLEY,
                                :
                 DEFENDANT.         Monroe, Louisiana
```

REPORTER'S OFFICIAL TRANSCRIPT OF MOTION TO SUPPRESS HEARING
BEFORE THE HONORABLE KAYLA D. MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:   MR. BRIAN CHRISTOPHER FLANAGAN
                     ASSISTANT UNITED STATES ATTORNEY
                     300 Fannin Street, Suite 3201
                     Shreveport, Louisiana


FOR THE DEFENDANT:   MS. SARA RUSSELL GIGLIO
                     GILMER & GIGLIO
                     3541 Youree Drive
                     Shreveport, Louisiana



                     DEBBIE LOWERY, RPR, CCR
                   Federal official Court Reporter
                   201 Jackson Street, Suite 312
                     Monroe, Louisiana 71201

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

1   A.   Yes.
2   Q.   Were you working that night in your capacity with Monroe
3   Police Department?
4   A.   Yes.
5   Q.   Did there come a time that evening where you responded to
6   a call for shots fired?
7   A.   Yes.
8   Q.   In responding to that call, did you ultimately wind up in
9   a parking lot on the 100 block of Olive Street in Monroe?
10  A.   Yes.
11  Q.   Can you walk us through how that came about from when you
12  first responded to that call to how you got to that parking
13  lot?
14  A.   I observed Officer McCarthy come over the radio and say
15  that he observed the sound of gunshots.  And a short while
16  later he said that he made contact with a witness or somebody
17  walking down the street who observed a dark-colored Charger
18  leaving the area where he heard gunshots.
19       A few minutes later we received a traffic complaint about
20  a couple vehicles going through the traffic barricades at
21  Millhaven, Millhaven and North 18th.  And one of those was a
22  dark-colored Charger.
23       I was in the area kind of northwest of that area, so I
24  started patrolling that area looking for that Charger.
25  Q.   Okay.  What happened next?

1  A.   I observed the sound of a vehicle revving its pipe, or
2  revving its engine.  So I looked to my south, and I saw a
3  Charger on North 2nd and it turned to the west.  And I thought
4  it turned on Breard Street.
5       So I turned on North 3rd and traveled down towards Breard
6  Street, and I didn't see it.  So I turned west and started
7  working my way back up to the area of 100 Olive Street where I
8  saw a dark blue Charger parked perpendicular to all the other
9  vehicles in the parking lot.
10 Q.   Okay.  Was that dark blue Charger that you just described
11 consistent with the description of the car that was described
12 to be involved in that shots fired situation?
13 A.   Yes.
14 Q.   When you saw the blue Charger, were you able to see who
15 the driver was?
16 A.   I was not.
17 Q.   Okay.  So you arrived at that parking lot and you see the
18 Charger.  What do you do?
19 A.   I exit my patrol unit, and I call additional officers, let
20 them know where I'm at and that I'm out with the vehicle.  And
21 30 seconds later I hear a sound in the back of a nearby truck.
22 Q.   Okay.  What did you do when you heard that sound?
23 A.   When I heard that sound, I started walking -- it was in
24 -- towards the back of the truck where I could keep the truck
25 and the Charger in my eyesight.

```
1   Q.   And what happened when you got to the back of the truck?
2   A.   When I got to the back of the truck, I observed a
3        gentleman in the back of the truck.
4   Q.   And then what did you do?
5   A.   I ordered him to show me his hands.  And then additional
6        officers arrived and we took him into custody.  And I checked
7        the other vehicles in the parking lot for anybody else that may
8        be there.
9   Q.   Were you able to identify who that was in the back of the
10       truck?
11  A.   By the end of the investigation, yes.
12  Q.   Who was it?
13  A.   His name was Isaac Bradley.
14  Q.   Okay.  Did you have a -- were you wearing a body camera at
15       that time?
16  A.   Yes, I was.
17  Q.   And did your body camera record some of the -- these
18       events that happened on November 19th, 2023?
19  A.   Yes, they did.
20  Q.   And have you reviewed your body camera footage from that
21       day?
22  A.   Yes.
23  Q.   And is it a fair and accurate copy of the recording of the
24       events in that footage?
25  A.   Yes.
```

```
 1  A.    I do not.
 2  (Playing audio/video recording)
 3          MR. FLANAGAN:  I'm going to pause it again 1 minute
 4  37 seconds.
 5  (By Mr. Flanagan)
 6  Q.    So we see you approaching a blue car.  Is this the blue
 7  Charger that you described?
 8  A.    Yes.
 9  Q.    When you approached this blue Charger, was it -- was
10  anyone in it?
11  A.    No, there was not.
12  Q.    Was the car running?
13  A.    The car was not running.
14  Q.    Were any of the windows down?
15  A.    At this time as I approach it, I did not see a window
16  rolled down.  Later I would see that the passenger window was
17  rolled down.
18  Q.    Okay.  Is that the front passenger window?
19  A.    The front.
20  Q.    Okay.  I got it.  Do you remember whether any of the doors
21  of the car were locked?
22  A.    I do not recall.
23  Q.    Okay.  And when you are looking into the car here, did you
24  see anything in plain view?
25  A.    I did not.
```

```
 1  BY MS. GIGLIO:
 2  Q.   All right.  Officer Morris, just a couple quick questions
 3  from me.  Thank you.
 4       You said that -- well, I don't know if you testified to
 5  this earlier or not, but you never saw Mr. Bradley get out of
 6  the car, did you?
 7  A.   I did not.
 8  Q.   And you don't know how many occupants of the car there
 9  were at some point before you came in contact with it, do you?
10  A.   I do not.
11  Q.   You don't know if he was the driver or a passenger or in
12  the car at all?
13  A.   I do not.
14  Q.   Okay.  Did anybody, other than law enforcement, ever show
15  up at the scene?
16  A.   Yes.
17  Q.   Okay.  Tell me about that.
18  A.   I believe it was Bradley's sister that showed up on the
19  scene.  There was just several other people that showed up, but
20  I only made contact with I believe his sister.
21  Q.   Okay.  Do you remember if somebody else showed up on the
22  scene asking for their phone?
23  A.   I do not recall.
24  Q.   Okay.  Mr. Flanagan talked to you about how Mr. Bradley
25  could be detained for trespassing given the facts that you had
```

```
 1   at the time.  Correct?
 2   A.   Correct.
 3   Q.   You already said you don't know what the business was that
 4   he was at.  Correct?
 5   A.   Correct.
 6   Q.   To be clear, there was never a trespassing call --
 7   A.   Correct.
 8   Q.   -- that came through dispatch saying somebody is on my
 9   property that shouldn't be here.
10   A.   Correct.
11   Q.   Correct?  Okay.  And, at the time, you wouldn't have known
12   if Mr. Bradley was the business owner?
13   A.   Correct.
14   Q.   And you wouldn't have known if he was properly renting the
15   business?
16   A.   Correct.
17   Q.   And you didn't know if the white truck that he was in was
18   even his truck?
19   A.   Correct.
20   Q.   And it didn't appear that you asked him that when you
21   first detained him, did you?
22   A.   No, I did not.
23   Q.   Okay.  So you didn't really know if he was trespassing or
24   not?
25   A.   Correct.
```

```
1    A.   No, I do not.  It had fleet trucks in it though, sir.
2    Q.   Okay.  Did you have any reason to think that this blue
3    Charger was involved in the shots fired call that you were
4    investigating?
5    A.   Yes, sir.
6    Q.   And what were those reasons?
7    A.   We were looking for two possible Dodge Chargers and a dark
8    pickup truck that had been traveling west of Millhaven.  So it
9    was west of the location where the initial shots were taking
10   place, as well as the fact that there was expended shell
11   casings in the floorboard as well as the bullet holes in the
12   vehicle consistent of being shot at.  And it was on private
13   property and abandoned.
14   Q.   Okay.  And did you think that the car might contain
15   evidence of a crime?
16   A.   Yes, sir.
17   Q.   Why did you think that?
18   A.   Shell casings, bullet holes, abandoned on private
19   property.
20   Q.   Did you think that the car might contain a gun?
21   A.   In all likelihood, yes, sir.
22   Q.   Okay.  I may have already asked you this, but just in
23   case, did you ever see who the driver was of the Dodge Charger?
24   A.   No, sir.
25   Q.   Did you see how many occupants it had?
```

```
 1   A.   No, sir, there was no one inside the vehicle when officers
 2   found it.
 3   Q.   Did you know whether or not there were any other potential
 4   occupants nearby in the area?
 5   A.   No.  We always take it as a likelihood, but could not
 6   confirm.
 7   Q.   Okay.  Did the Dodge Charger, as you found it, present any
 8   concerns for the safety of the public?
 9   A.   Safety to the public at that time other than it just being
10   as part of the crime already, no, sir; possibly being part of
11   the initial crime, no, sir.
12   Q.   But if you thought it contained a gun and the windows were
13   rolled down and it was unlocked, would you just leave it there?
14   A.   No, sir.
15   Q.   What would you do?
16   A.   Secure it.  If there's a firearm viewed, vehicle is
17   unsecured, secure the firearm.
18   Q.   Okay.  And so the vehicle, the Dodge Charger, was in fact
19   searched?
20   A.   Yes, sir.
21   Q.   Can you provide just a summary of what all was recovered
22   during the search.
23   A.   Spent magazine, Glock 43 with magazine still in it, which
24   I cleared, as well as seven shell casing, 9 millimeter, and a
25   phone.  That was by the gun underneath the driver seat.
```

```
 1   phones as well?
 2   A.   Correct.
 3            MS. GIGLIO:  Okay.  One second.  I just need a
 4   moment.  It's just not about to get painful or anything.
 5   Q.   All right.  So your description of the phones was darker
 6   blue/gray iPhone in one of those warrants.  Is that correct?
 7   A.   Correct.
 8   Q.   Right.  You mentioned that when the phone gets brought
 9   back to you, it's placed in a bag, some type of evidence bag?
10   A.   Yeah.
11   Q.   Is there a label put on that evidence bag?
12   A.   Yes.
13   Q.   Okay.  What kind of information is on that label?
14   A.   I have case number and date and time of the incident and
15   where the phone was located from.
16   Q.   Okay.  So it's fair to say that the information on the
17   outside of that evidence bag would help you further identify
18   the phone?
19   A.   Correct.
20   Q.   Okay.  You're aware that there are probably thousands of
21   dark blue/black iPhones.  Right?
22   A.   Yes.
23   Q.   Okay. And what you wrote in your affidavit for the search
24   warrant doesn't -- or what you described in your search warrant
25   doesn't narrow it down beyond that, does it?
```

```
 1   the search warrant.
 2   Q.   Okay.
 3   A.   But I guess what you're asking the search warrant itself?
 4   Q.   The search warrant itself.
 5   A.   It just has the description of the phone.
 6   Q.   Correct.  Correct.  Without all the additional information
 7   about -- that would be listed on the outside of that evidence
 8   bag?
 9   A.   Okay.  Correct.
10   Q.   Is that correct?
11   A.   Yes.
12   Q.   Okay.  Did you have to get any approval before you sought
13   the search warrant, or do you just take it straight to the
14   judge?
15   A.   It's sent to the judge.
16   Q.   Okay.  I'm going through the list of some of the things
17   that you requested in the search warrant.
18        Did you get any photographs of the interior and exterior
19   of the cell phone?
20   A.   Personally, no, I did not.
21   Q.   Did the forensic examiner, to your knowledge?
22   A.   To my knowledge, I don't know.
23   Q.   Okay.  What about DNA swabs of the interior -- swabs, I'm
24   sorry -- of the interior of the cell phone?
25   A.   I did not.
```

```
 1   Q.   Okay.  What about DNA swabs of the exterior of the cell
 2   phone?
 3   A.   I did not.
 4   Q.   Okay.  What about patent prints from the interior of the
 5   cell phones?
 6   A.   No.
 7   Q.   What about the exterior?
 8   A.   No.
 9   Q.   Because you didn't need those things in this particular
10   case.  Right?
11   A.   Correct.
12   Q.   Were you present when the forensic download was done?
13   A.   No.
14   Q.   Okay.  So you just send the warrant over to the person
15   doing the forensic download, and they handle it from there, and
16   then you get the report?
17   A.   Correct.
18   Q.   You're not present when it happens?
19   A.   No.
20              MS. GIGLIO:  Okay.  No further questions.
21              THE COURT:  All right.  Any redirect?
22              MR. FLANAGAN:  Just very briefly, Your Honor.
23              THE COURT:  Okay.
24                        REDIRECT EXAMINATION
25   BY MR. FLANAGAN:
```