# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO.  3:24-CR-00031-01 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| ISAAC BRADLEY (01) | MAG. JUDGE KAYLA D. MCCLUSKY |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are Motions to Suppress [docs. #32, 46] filed by Defendant Isaac Bradley.  The motions are opposed.  [docs. #35, 48].  For reasons stated below, IT IS RECOMMENDED that the motions be DENIED.

## Background

On the evening of November 19, 2023, the Monroe Police Department ("MPD") received a 911 call reporting shots fired in the vicinity of Renwick Street and Powell Avenue in Monroe, Louisiana.  (Memo in Support of M/Suppress [doc. #33, p. 1]; Opp. to M/Suppress [doc. #35, p. 2]).  The caller described a rolling shootout between two dark-colored cars and a pickup truck.  (Memo in Support of M/Suppress [doc. #33, p. 1]; Opp. to M/Suppress [doc. #35, p. 2]).  A second 911 call indicated that the vehicles had traveled down Millhaven Road, near Texas Avenue, before heading north on the N. 18th Street overpass.  (Memo in Support of M/Suppress [doc. #33, p. 1]; Opp. to M/Suppress [doc. #35, pp. 2-3]).

MPD officers responded to the area of the reported shooting.  (Memo in Support of M/Suppress [doc. #33, p. 1]; Opp. to M/Suppress [doc. #35, p. 3]).  Thereafter, an "Indigo Blue" Dodge Charger ("the Charger") was seen by officers traveling south on Walnut Street at a high rate of speed.  (Opp. to M/Suppress [doc. #35, p. 3]).  The Charger was later observed in a parking lot

on the 100 block of Olive Street. *Id.* The vehicle was improperly parked, blocking other parked vehicles, and the passenger-side front window was down. *Id.* The Charger was unoccupied when officers found it. (Post-Hearing Memo [doc. #64, p. 3]). Multiple bullet holes were visible on the Charger's exterior. (Opp. to M/Suppress [doc. #35, p. 3]). One officer, while looking through the window, noticed a firearm underneath the driver's seat. (Post-Hearing Memo [doc. #64, p. 3]). Within the Charger, MPD officers found five (5) fired shell casings on the front passenger floorboard, two (2) fired shell casings on the rear floorboard, two cell phones, two ten-round magazines – one containing five (5) rounds, the other one (1) round – and a loaded Glock 43 X 9mm semi-automatic pistol with serial number BYAY219. (Memo in Support of M/Suppress [doc. #33, p. 1]; Opp. to M/Suppress [doc. #35, p. 4]).

Bradley was found hiding in the bed of a pickup truck parked in the same lot as the Charger. (Memo in Support of M/Suppress [doc. #33, p. 1]; Opp. to M/Suppress [doc. #35, p. 3]). Bradley was taken into custody and, after being *Mirandized*, questioned. (Opp. to M/Suppress [doc. #35, p. 3]). He provided no answer when asked if he had operated the Charger or had been the only person inside the car. (Memo in Support of M/Suppress [doc. #33, p. 2]; Opp. to M/Suppress [doc. #35, p. 3]). Bradley did state that the Charger was owned by Timothy Whitfield. (Opp. to M/Suppress [doc. #35, p. 3]).

The two cell phones seized from the search of the Charger were subsequently searched pursuant to two search warrants. (Post-Hearing Memo [doc. #63, p. 2]). The search warrants sought to seize and examine electronic data including, but not limited to:

1. Any voice messages, test messages, phone numbers, pictures, GPS, and other electronic data and or media contained within the hardware, or cellular operating system of the cellular phone that identifies the owner and or possessor of the cellular phone.

2.  Any and all voice messages, text messages, phone numbers, pictures, GPS, and other electronic data and or media contained within the hardware, software, and or microprocessors of the cellular phone related to the below listed crimes.

3.  Any Voice messages, text message, phone numbers, pictures, GPS, and other electronic data and or media contained within the Mini Secure Digital (MiniSD), MultiMedia Card Mobile (MMCmobile), or any other types of card slots support removable memory cards or specialized peripherals, such as an SDIO Wi-Fi card and or cellular operating system related to the below listed crimes.

4.  Any photographs, test messages, phone logs, or GPS information located within the internal memory of the cellular phone related to the below listed crimes.

5.  Any and all hidden, erased, compressed, password protected, and/or encrypted files as they relate to the below listed crimes.

6.  Photographs of the interior and exterior of the cellular phone

7.  DNA swabs both interior and exterior of the cellular phone

8.  Latent prints of both interior and exterior of the cellular phone

9.  Any and all voice messages, text message, phone numbers, pictures, GPS, and other electronic data and or media contained within Wireless communications such as infrared (i.e., IrDA) or Bluetooth that may be built in the device related to the below listed crimes.

10. Personal Information Management (PIM) applications that includes phonebook and date book facilities, and a means to synchronize PIM information with a desktop computer.

(Search Warrant [doc. #46-4, p. 1]; Search Warrant [doc. #46-5, p. 1]).

On February 28, 2024, a federal grand jury returned a one-count Indictment charging Bradley with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Indictment [doc. #1]). Bradley was arraigned on March 14, 2024, at which time he pled not guilty. [doc. #18]. At the arraignment, the detention hearing was continued until March 21, 2024; on that date, the undersigned found the Government had met its burden for detention. [doc. #20].

On April 24, 2024, Bradley filed the initial motion to suppress evidence seized and statements made as a result of the search of the Charger on November 19, 2023. (M/Suppress [doc. #32].) He also requested a hearing on the motion. *Id.* Bradley argues that there was insufficient justification to seize and arrest him, he had an expectation of privacy as to the Charger, the search of the Charger was unauthorized under the Fourth Amendment, and the search was not incident to his arrest. (Memo in Support of M/Suppress [doc. #33]). The Government filed its opposition on May 24, 2024, arguing that Bradley was properly seized, that he lacks standing to challenge the search of the Charger, and, alternatively, that the search was pursuant to several exceptions to the Fourth Amendment's warrant requirement. (Opp. to M/Suppress [doc. #35]).

Bradley then filed a second Motion to Suppress to suppress any evidence obtained by the search of the two cell phones that were seized during the search of the Charger. [doc. #46]. He argues the evidence should be suppressed because (1) the search warrants were overbroad and lacked particularity as to the depth of the search; (2) there is no apparent nexus between the crimes alleged and the evidence sought to be obtained from the cell phones; (3) the descriptions of the cell phones lacked particularity; and (4) the warrants were stale by the time they were executed. *Id.*

On July 19, 2024, the Government filed its opposition to Bradley's second Motion to Suppress. [doc. #48]. The Government contends that (1) Bradley does not have standing to raise these challenges because he has failed to assert an expectation of privacy in the phones; (2) even if Bradley has asserted a valid expectation of privacy, he abandoned the cell phones, and, thus, has no standing; and (3) there is no Fourth Amendment violation with the warrants, and even if there was, the good faith exception applies. *Id.*

A hearing on the Motions to Suppress was held on August 26, 2024. Bradley filed his post-hearing memorandum on September 30, 2024, reiterating his argument that the search of the Charger was unlawful as the search was conducted without consent or a search warrant. (Post-Hearing Memo [doc. #63, p. 2]). As to the arrest and seizure of Bradley, he argues that the officers had no probable cause to detain him. *Id.* at pp. 2-3. Bradley's contention is that the officers had no probable cause to believe he was trespassing, and their testimony at the hearing confirmed that the officers had no way of knowing if Bradley was authorized on the property or not. *Id.* at p. 3. Finally, Bradley restates his argument that the warrants for the two cell phones lacked particularity and extended the scope of the search beyond what is constitutional. *Id.* at pp. 3-5.

The Government's response to Bradley's post-hearing memorandum, filed on October 18, 2024, reaffirmed its argument that Bradley has no standing to challenge the search of the Charger or the two cell phones seized from the vehicle. (Post-Hearing Memo [doc. #64, p. 1]). Even if Bradley does have standing, his challenges to the search of the vehicle fail as (1) the automobile exception to the warrant would apply; (2) it was a proper protective search as officers reasonably believed it contained a firearm; and (3) the search for a firearm or other dangerous weapon was proper under the community caretaking exception. *Id.* at p. 2. With respect to the cell phones, if Bradley does have standing to challenge the searches, the Government argues (1) there was no Fourth Amendment violation, and, if there was, the good faith exception applies; (2) the warrants were supported by probable cause; and (3) the cell phones were adequately described. *Id.* Finally, as to the detainment of Bradley, the Government contends that since he was hiding in the back of a pickup truck on nonresidential, private property, this gave the officers reasonable suspicion to detain him. *Id.* at p. 11.

Briefing is complete. Accordingly, the matter is ripe.

### Relevant Testimony and Evidence

During the hearing, the Government presented six witnesses: Officer David Morris; Officer Rhys Breazeale; Corporal Alderrius McCarthy; Detective Ross Lambert; Shannon Harkins; and Detective Andrew Stadius.  Additionally, six exhibits were introduced and admitted into evidence. Exhibits 1 and 2 were GrayKey Progress Reports from the cell phone searches. (Hearing Transcript [doc. #62, pp. 51-52, 67]) (hereinafter abbreviated as "Tr." followed by the page number). The third exhibit was the forensic intake form for the iPhone 11 Pro Max and iPhone 13 Pro Max.  (Tr. 64-66).  Exhibit 4 contained eight photographs from the November 19, 2023 shots-fired investigation.  (Tr. 23).  Exhibits 5 and 6 were body camera footage from Officer Morris and Corporal McCarthy, respectively, both recorded on November 19, 2023.  (Tr. 8, 37).

The Court summarizes the relevant testimony and evidence as follows:

The Government's first witness was Officer David Morris ("Morris"), a crime scene investigator with the MPD for over five years.  (Tr. 3-4).  In November of 2023, Morris was a patrolman.  (Tr. 4).  Prior to Morris joining the MPD, he worked for the Sterlington Police Department for four years.  (Tr. 4).  Morris was on duty during the investigation of Bradley on November 19, 2024.  (Tr. 5).

### I.    Detainment of Bradley

Morris responded to Corporal McCarthy's radio report of gunshots.  (Tr. 5).  Corporal McCarthy then informed Morris that he had made contact with a witness who observed a dark-colored Charger leaving the area where he heard gunshots.  (Tr. 5).  Shortly after, Morris received a complaint about vehicles, including a dark-colored Charger, driving through barricades between Millhaven and North 18th.  (Tr. 5).  Following the Charger by sight and sound, Morris located a dark blue Charger parked on 100 Olive Street, blocking other vehicles in a business parking lot.

(Tr. 6, 10).  As he approached, he did not observe anyone exiting the vehicle or identify the driver. (Tr. 6, 13).

Upon parking, Morris called for additional officers.  (Tr. 6).  Moments later, he heard a noise near a nearby white truck and saw Bradley inside the bed of the truck.  (Tr. 6-8).  Although no formal trespassing report was made, Morris suspected Bradley was trespassing and possibly linked to the shots-fired incident.  (Tr. 11, 14).  Bradley was detained, and officers searched the parking lot, confirming that Bradley was the only individual present.  (Tr. 7, 12).  Morris could not determine if Bradley had driven the Charger.  (Tr. 13).

The Government then called Officer Rhys Breazeale ("Breazeale") to the stand.  (Tr. 16). Breazeale, a Monroe police officer with three and a half years of experience, was on duty the night of the investigation.  (Tr. 17).  Breazeale was attempting to intercept the vehicles reported in the shots-fired incident when he received a call from Morris, who had one suspect at gunpoint.  (Tr. 18).  Breazeale drew his weapon to assist Morris as he detained Bradley in the truck bed.  (Tr. 19).

## II.    Search and Seizure of the Charger

After Bradley was in custody, Breazeale noted that the Charger matched the description from the shots-fired call.  (Tr. 19).  Observing from outside the vehicle, Breazeale saw the engine off, bullet holes in the windows and doors, shell casings on the floor, and a window rolled down. (Tr. 20).  Another officer spotted a firearm under the driver's seat.  (Tr. 20).

After making his observations, Breazeale concluded that the Charger was likely linked to the shots-fired report.  (Tr. 21).  He came to this conclusion based on the location of the Charger and the visible evidence of gunfire.  (Tr. 21).  The Charger was fully searched, and the Government entered eight photographs from the investigation into evidence as Exhibit 4.  (Tr. 23-25).

The first photograph showed a bullet hole in the rear passenger quarter panel of the Charger. (Tr. 24). The second captured a bullet hole in the front passenger quarter panel. (Tr. 24). The third image focused on the passenger side mirror, where another bullet hole was visible. (Tr. 24). In the fourth photo, the windshield displayed damage consistent with a bullet hole. (Tr. 24). The fifth showed the front passenger door window, also with a bullet hole. (Tr. 24). Photograph six revealed an exit mark near the passenger seat belt. (Tr. 25). Breazeale testified that the seventh image depicted a bullet hole in the front passenger door and side mirror. (Tr. 25). Finally, the eighth photograph included the front and rear passenger doors, along with a view of the parking lot where the Charger and a white truck was located. (Tr. 25).

The Government then called its third witness, Corporal Alderrius McCarthy ("McCarthy"). (Tr. 31). McCarthy is a traffic division officer and has been employed by MPD for six and a half years. (Tr. 32). On the night in question, he responded to gunfire east of his location and was alerted to vehicles running through barricades on Millhaven. (Tr. 32-33). When McCarthy arrived at Millhaven, he observed multiple damaged barricades. (Tr. 33). McCarthy was then informed that officers had located the Charger on Olive Street. (Tr. 34).

McCarthy inspected the Charger, noting it was abandoned with the passenger window down and multiple gunshot holes. (Tr. 34). Using a license plate reader, McCarthy tracked the Charger's movements, confirming it was in the vicinity at the time of the shooting. (Tr. 35-36). This information was obtained on the night of the incident and confirmed the Charger's presence near the reported gunfire. (Tr. 36, 43).

McCarthy's body camera recorded footage from the night of Bradley's investigation. (Tr. 37) (Exhibit 6). The footage shows McCarthy interviewing Bradley. (Tr. 38). During their conversation, McCarthy said, "Obviously you were trying to get away from the car for a reason,"

to which Bradley responded, "Right."  (Tr. 38).  Bradley then mentioned that he "just got out on foot," which McCarthy understood to mean that Bradley had exited a vehicle or another location and began moving on foot.  (Tr. 40).

McCarthy also asked Bradley who the registered owner of the Charger was.  (Tr. 40). Bradley replied that it was "Timothy Whitfield."  (Tr. 40).  McCarthy later confirmed that Timothy Whitfield was indeed the registered owner of the Charger.  (Tr. 40).

McCarthy testified that a brief conversation with Bradley had not been recorded on the body camera.  (Tr. 41).  In that exchange, Bradley explained that he had been travelling, saw the officers, became spooked, and, as a result, pulled the Charger into the parking lot and exited the vehicle. (Tr. 41).  This conversation was noted in McCarthy's incident report.  (Tr. 41).

### III.     Seizure and Search of the Two Cell Phones

Two cell phones were seized from inside the Charger.  (Tr. 44).  McCarthy testified that he believed the phones held evidentiary value, as they were inside the Charger and could potentially provide location data through pings.  (Tr. 45).  After seizing the phones, he placed them on airplane mode, and a detective collected them from the supervisor's office the following morning.  (Tr. 45).

The Government then called its fourth witness, Detective Ross Lambert ("Lambert").  (Tr. 46).  Lambert has served as a detective with the MPD for approximately four years, working in criminal investigations, including on the night of Bradley's investigation.  (Tr. 46-47).  Lambert's involvement in the case included obtaining two search warrants for the cell phones seized from the Charger.  (Tr. 47).

Patrol officers initially placed the cell phones in sealed envelopes, marked with the case number and the date and time of the incident, before transferring them to Lambert.  (Tr. 47, 49, 55).  The phones remained in law enforcement custody from the time they were recovered until

Lambert took possession.  (Tr. 47).  Lambert believed the phones had evidentiary value, as they could provide geolocation data and potentially help identify the phones' owners.  (Tr. 54).

Lambert obtained two state search warrants for the cell phones.  (Tr. 48).  The first phone, described in the warrant as a blue iPhone in a red case, and the second, described as a darker gray/blue iPhone, were typical descriptions used in search warrants.  (Tr. 48).  The warrants included these descriptions, while the accompanying affidavits, not incorporated into the warrants, provided the case number and the date and time the phones were seized.  (Tr. 56-57).

After the warrants were issued on November 29, 2023, Lambert transported the phones to Detective Harkins, who performed data extractions on December 4, 2023.  (Tr. 53).  The Government then introduced and admitted Exhibits 1 and 2, progress reports from Detective Harkins.  (Tr. 51, 52).  Lambert's name appears by "examiner name" on both progress reports because he obtained the search warrants.  (Tr. 51, 52).

In the search warrants, Lambert had requested photographs, DNA swabs, and patent prints from the phones' interiors and exteriors.  (Tr. 57-58).  However, these were not conducted as they were deemed unnecessary for this case.  (Tr. 57-58).

The Government's fifth witness was Shannon Harkins ("Harkins"), who has been employed by the Ouachita Parish Sheriff's Office for over twenty-seven years, specializing in computer and mobile forensics.  (Tr. 60-61).  He currently manages the forensic lab, where he conducts cell phone extractions, having completed approximately 600 throughout his career.  (Tr. 61).

In Bradley's case, Harkins received two cell phones from Lambert, each sealed in an envelope with the case number, detective's name, and the relevant evidence information.  (Tr. 62, 63).  Harkins performed forensic extractions on both phones, creating a bit-by-bit digital image of

each device's data, which he then processed into an evidence report using forensic software.  (Tr. 62).

Harkins follows a detailed procedure for handling and processing evidence.  Upon receiving the phones, he completes an intake form with the detective delivering the evidence, labels the phones, and keeps them with the corresponding paperwork.  (Tr. 63).  For iPhones, Harkins typically uses GrayKey and Cellebrite forensic tools.  (Tr. 63).  If the phone has not lost power, he can connect it to the software and begin the extraction immediately.  (Tr. 64).

The Government introduced Exhibit 3, the forensic intake form Harkins completed for the iPhone 11 Pro Max, which notes an intake date of December 4, 2023, and a start date of December 13, 2023, for the extraction.  (Tr. 64-66).  For this phone, Harkins used both the Cellebrite PAAS tool and GrayKey, generating a forensic report of 141 gigabytes.  (Tr. 66, 67).  Due to the need to crack the passcode, the extraction took place from December 13, 2023, to February 7, 2024, with Cellebrite successfully gaining initial access on February 6, 2024.  (Tr. 67, 68).  Using the passcode provided from Cellebrite, the iPhone was transferred to the GrayKey device for an extraction.  (Tr. 68).

Page two of the forensic intake form, Exhibit 3, pertains to the second device, an iPhone 13 Pro Max, which was also received on December 4, 2023.  (Tr. 70).  Using GrayKey, Harkins completed the extraction on this device in one day, as the phone had not lost power, allowing for a live extraction without waiting to bypass a passcode.  (Tr. 71).  Once the GrayKey extraction was completed, Harkins used Axiom to create an evidentiary report.  (Tr. 70).  The resulting report totaled 343 gigabytes.  (Tr. 71).

Before performing any extraction, Harkins verifies that the device description in the search warrant matches the device he is about to process, and he confirmed that he experienced no confusion regarding which phones the search warrants covered in this case. (Tr. 72-73).

Once the extraction is complete, the data is processed through report-generating software, which parses and organizes the data from GrayKey into an evidentiary report, known as an Axiom report. (Tr. 73-74). This report, along with the extracted data, is then returned to the assigned detective. (Tr. 73-74).

The Government's final witness was Detective Andrew Stadius ("Stadius"), a crime investigator with the MPD, where he has been employed for five years. (Tr. 76-77). Stadius specializes in Cellebrite's phone extractions. (Tr. 77). In the Bradley investigation, Stadius conducted digital analysis on the two cell phones. (Tr. 78).

Stadius's role involved analyzing the downloaded data for any evidence related to the crime. (Tr. 78). Stadius creates a report on any evidence he finds that is pertinent to the case. (Tr. 78). Stadius did not photograph or collect DNA or prints from the phones' interiors or exteriors. (Tr. 80). The report in this case was completed on February 12, 2024, and once the report was completed, Stadius conducted a search warrant return. (Tr. 79). The closing date for both the iPhone 11 Pro Max and iPhone 13 Pro Max occurred on February 16, 2024. (Tr. 79).

## **Law and Discussion**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend. IV. The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted). "The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the

evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted).

Evidence obtained in violation of the Fourth Amendment is generally excluded and "'cannot be used in a criminal proceeding against the victim of the illegal search or seizure.'" *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "'the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).

## I.      Standing

"[A] criminal defendant seeking suppression must show that 'his *own* Fourth Amendment rights [were] infringed by the search [or] seizure which he seeks to challenge.'" *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (quoting *Byrd v. United States*, 584 U.S. 395, 403 (2018)). This concept is described as one of Fourth Amendment standing, which should not be confused with Article III standing. *United States v. Rodriguez*, 33 F.4th 807, 811 (5th Cir. 2022) (citing *Byrd*, 584 U.S. at 411).

Whether a defendant has standing to contest the validity of a search or seizure depends on two factors: (1) whether he is able to establish an actual, subjective expectation of privacy with respect to the place being search or items seized and (2) whether that expectation of privacy is "one which society would recognize as reasonable." *Iraheta*, 764 F.3d at 461.

"[A] person has no standing to challenge a search or seizure of property that was voluntarily abandoned" or conveyed to another. *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013)

(citing *United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993) (holding defendant lacked standing to object to a search of a garment bag after denying ownership and voluntarily abandoning the bag in a motel room). A defendant who abandons or disclaims ownership of property prior to the search does not have standing to challenge a search subsequent to his abandonment or disclaimer of that property. *Iraheta*, 764 F.3d at 461; *see, e.g., United States v. Johnson*, No. 07-30955, 2008 WL 3876550, at *2-3 (5th Cir. 2008) (holding that a defendant had no standing when he had abandoned a fanny pack by leaving it on another's property without permission prior to the search); *United States v. Roman*, 849 F.2d 920, 922 (5th Cir. 1988) (holding that a defendant had no standing because the defendant had abandoned his luggage prior to the search at an airport). "Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other objective facts—the question being whether the actor has voluntarily discarded or relinquished his interest in the property in question." *United States v. Scrivner*, 680 F.2d 1099, 1100 (5th Cir. 1982).

   *(a) The Charger*

   First, the Court must determine whether Bradley has established an actual, subjective expectation of privacy in the Charger that was searched. In Bradley's initial motion to suppress, he argued there was no evidence that he was the driver of the Charger. (Memo in Support of M/Suppress [doc. #33, p. 2]). When questioned by officers, Bradley repeatedly denied ownership of the vehicle. (Tr. 40). Bradley now contends that despite his disclaimer of ownership or any connection to the Charger, he held an expectation of privacy in it. These two assertions are contradictory. Bradley has neither claimed he was an occupant or driver of the Charger nor demonstrated any subjective expectation of privacy in the vehicle. By explicitly disclaiming ownership prior to the search, Bradley lost any standing to challenge the subsequent search of the

Charger. *See Iraheta*, 764 F.3d at 461. Therefore, the Court finds that Bradley lacks standing to challenge the search of the Charger.

Furthermore, even if Bradley could have demonstrated an expectation of privacy and established standing, he forfeited this standing by abandoning the Charger. When officers located the Charger in a private business parking lot, the engine was off, a window was rolled down, and there were multiple bullet holes to its exterior. (Tr. 34). There was no occupant located in the Charger. (Tr. 34). The Charger, for all practical purposes, was abandoned in the parking lot. By leaving the Charger in these circumstances, to the extent he had any privacy interests, Bradley forfeited his interests by abandoning the vehicle.

ACCORDINGLY, IT IS RECOMMENDED that the Motions to Suppress be DENIED insofar as they seek to exclude evidence obtained from the search of the Charger, as Bradley has no standing to contest the search.

*(b) The Two Cell Phones*

The two cell phones at issue were recovered during a search of the Charger. (Opp. to M/Suppress [doc. #35, p. 4]). Bradley's second motion to suppress asserts that the cell phones "were seized from the vehicle near where he was stopped." (M/Suppress [doc. #46, p. 1]). During the investigation, an officer answered an incoming call on one of the cell phones found in the vehicle. (Opp. to M/Suppress [doc. #48, p. 9]). Bradley subsequently complained that the officer had answered "his phone." *Id.* However, no evidence was introduced at the hearing to clarify which of the two cell phones Bradley may have been referring to in his statement. Additionally, neither party provided any further evidence or arguments regarding this comment in their Post-Hearing Memorandums.

To establish standing to challenge the search of these cell phones, Bradley would need to show a subjective expectation of privacy in the phones that society would recognize as reasonable. Bradley has not directly claimed ownership or provided evidence of a privacy interest in either device. None of Bradley's motions or supporting memorandums even suggest that he owned or had any personal connection to the cell phones. The closest link the Court can identify is that the cell phones were retrieved from a vehicle located near where Bradley was found in the back of a pickup truck. His offhand comment, while suggestive, lacks sufficient evidentiary support to establish a subjective expectation of privacy in either cell phone. Absent Bradley demonstrating that his *own* Fourth Amendment rights are infringed by the search, Bradley lacks standing to contest the search of these phones.

Even assuming Bradley had standing, it would be forfeited due to abandonment. The Charger, which contained the two cell phones, was left on private property without the owner's permission. *See* discussion *infra*. By leaving the vehicle in a random business parking lot, Bradley effectively relinquished any privacy interest he may have had in the phones by voluntarily leaving them behind in an unsecured location. Thus, Bradley abandoned the cell phones, and any expectation of privacy was extinguished when he left the phones and the vehicle behind.

ACCORDINGLY, IT IS RECOMMENDED that the Motions to Suppress be DENIED to the extent they seek to exclude evidence obtained from the search of the two cell phones found inside the Charger, as Bradley has no standing to contest the searches.

## II.    Search of the Charger

The Court finds that Bradley has no standing to challenge the search of the Charger. Nonetheless, even if Bradley did have standing to challenge the search, the undersigned finds that the automobile exception to the Fourth Amendment warrant requirement would apply.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991). One such exception that is "specifically established and well-delineated" is the so-called automobile exception. *United States v. Ross*, 456 U.S. 798, 825 (1982).

Under the automobile exception, officers may search a car that "is readily mobile and probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). Probable cause to search such a vehicle exists where "'trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband.'" *United States v. Flores-Manjarez*, 421 F. App'x 407, 410 (5th Cir. 2011) (quoting *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)). The probable cause determination is based on the totality of the circumstances. *Id.*

When officers arrived at the parking lot and located the Charger, they observed that it was unoccupied, the engine was off, a window was rolled down, and there were bullet holes to its exterior. (Tr. 20, 34). Upon looking through the window, an officer saw a weapon inside the vehicle. (Tr. 20). The officers were responding to a shots-fired call, and a vehicle involved in the reported incident had been described as a dark-colored Charger. (Tr. 5, 19). The Charger they found was dark blue and showed visible signs of gunfire damage. (Tr. 21, 34).

Given the call and their own observations, a reasonably prudent person would believe that the Charger contained contraband. Officers could clearly see a weapon inside the vehicle, and the vehicle's condition aligned with the witness's report of shots fired. Therefore, even if Bradley had

standing to challenge the search, the search would be deemed reasonable under the Fourth Amendment, as the automobile exception to the warrant requirement would apply.

### III.    Search of the Two Cell Phones

The Court finds that Bradley lacks standing to challenge the search of the two cell phones. Nonetheless, even assuming Bradley had standing, the searches were conducted lawfully pursuant to valid search warrants.

#### (a) Depth of Search Warrants

"To avoid fatal generality, the place and items to be seized must be described with sufficient particularity so as to leave nothing to the discretion of the officer executing the warrant." *United States v. Triplett*, 684 F.3d 500, 505 (5th Cir. 2012) (citations omitted). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). There must be some nexus between the items seized and the criminal activity being investigated. *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006). Warrants that authorize an "all records" search require "much closer scrutiny" under the Fourth Amendment and are only upheld in "extreme cases" where the alleged crime is pervasive, closely intertwined with the place to be searched, and the items to be seized are sufficiently limited and linked to the alleged crime. *United States v. Humphrey*, 104 F.3d 65, 69 (5th Cir. 1997).

The two cell phones were discovered inside the Charger, a vehicle with gunshot damage that officers believed was involved in a reported shooting. (Opp. to M/Suppress [doc. #35, p. 4]). Officers reasonably considered the phones to have evidentiary values, as they could provide

geolocation data and potentially assist in identifying both the phones' owners and firearm owner—information relevant to the criminal investigation. A clear nexus exists between the phones, the data requested by the search warrants, and the criminal investigation.

Bradley argues that the warrants' over breadth is "directly proven" by Lambert's testimony, where he stated he "sought information in the search warrant that he never acted on." (Post-Hearing Memo [doc. #63, pp. 3-4]). Bradley points to Lambert's unfulfilled requests for DNA swabs, patent prints, and photographs as proof of this alleged over breadth. *Id.* at p. 4. However, an officer's request for more information that is ultimately not obtained does not, in itself, render a warrant overbroad. Lambert testified that a primary goal of the search warrants was to identify the phones' owners, and these specific requests were reasonable steps to establish ownership. The fact that some investigative options were not pursued does not affect the validity of the warrant or its focus on items relevant to the investigation. The searches were therefore appropriately tailored to the investigation's needs.

Additionally, Bradley contends that the Government sought a search "for essentially everything on the phone." *Id.* However, the warrants did not authorize a "free for all," as Bradley suggests. Instead, the warrants specified particular types of data to be seized, listing items such as "any voice messages, text message, phone numbers, pictures, GPS, and other electronic data and or media . . . that identified the owner and or possessor of the cellular phone . . ." (Search Warrant [doc. #46-4, p. 1]). These targeted requests were limited to data pertinent to the case, aligning with the Fourth Amendment's particularity requirement. The warrants did not permit the Government to seize all data indiscriminately from the phones but rather restricted the search to information relevant to ownership and involvement in the suspected criminal activity.

Therefore, even if Bradley had standing to challenge the searches of the two cell phones, the searches would still be valid, as the warrants adequately provided a nexus to the cell phones to the criminal activity investigated and were narrowly tailored to the investigation's needs.

*(b) Descriptions in Search Warrants*

The Fourth Amendment requires that warrants "'particularly describe the place to be searched, and the persons or things to be seized.'" *Triplett*, 684 F.3d at 504 (quoting U.S. CONST. amend. IV). Reasonable specificity is required, not "elaborate detail." *Id.* (quoting *United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994)). The Fifth Circuit has recognized that detailed particularization often is impossible. *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir. 1984). Generic language suffices if it particularizes the types of items to be seized. *Id.* A warrant's particularity is sufficient if "'a reasonable officer would know what items he is permitted to seize.'" *United States v. Fulton*, 928 F.3d 429, 434 (5th Cir. 2019) (quoting *United States v. Aguirre*, 664 F.3d 606, 614 (5th Cir. 2011)).

The first phone was described as a blue iPhone in a red case, and the second was described as a darker gray/blue iPhone. (Tr. 48). Bradley argues that these descriptions lack sufficient particularity. (Post-Hearing Memo [doc. 63, p. 3]). Although the warrant affidavits included the case number, date, and time the phones were seized, the affidavits were not incorporated into the warrant. (Tr. 56-57). Bradley contends that these descriptions alone could apply to thousands of similar cell phones. (Post-Hearing Memo [doc. 63, p. 3]).

However, the cell phones in question had already been seized and were in the Government's possession. The warrant descriptions were not intended to locate unspecified iPhones at large but rather to identify specific items already in custody. While thousands of iPhones may match these descriptions nationwide, the Government was not dealing with a vast pool of similar devices.

Since these phones were already in custody, a reasonable officer would understand exactly which cell phones the warrants referenced. The search warrants provided descriptions that were sufficiently particular to identify the iPhones in the Government's possession.

Therefore, even if Bradley had standing to challenge the searches of the two cell phones, the searches would still be valid, as the warrants adequately specified the cell phones to be searched.

### (c) Staleness of Warrants

The Fourth Amendment "'contain[s no] requirements about when the search or seizure is to occur or the duration.'" *United States v. Jarman*, 847 F.3d 259, 266 (5th Cir. 2017) (quoting *United States v. Cote*, 72 M.J. 41, 44 (C.A.A.F. 2013)). Staleness is determined by the facts of each case. *Webster*, 734 F.2d at 1056. Courts have therefore consistently "'permitted some delay in the execution of search warrants involving computers because of the complexity of the search'" and they often restrict their "'analysis of the delay in executing. . . warrants [to] consider[ing] only whether the delay rendered the warrants stale.'" *Jarman*, 847 F.3d at 266 (quoting *United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009); *United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005)).

The search warrants for the cell phones specify that, depending on scheduling and technical issues, "the examination of the aforementioned electronic data may be extended beyond the 10 day limitation . . ." (Search Warrant [doc. #46-4, p. 2]; Search Warrant [doc. #46-5, p. 2]). The warrants were issued on November 29, 2023, and Detective Lambert transported the phones to Detective Harkins on December 4, 2023. (Tr. 50, 53).

Regarding the iPhone 11 Pro Max, intake occurred on December 4, 2023. (Tr. 65). Harkins needed to bypass the passcode, which required a forensic tool that operated in the background from

December 13, 2023, to February 6, 2024, in order to access the passcode. (Tr. 67, 68). The data extraction was completed on February 7, 2024. (Tr. 67).

For the iPhone 13 Pro Max, intake also occurred on December 4, 2023. (Tr. 70). Since this device had not lost power, Harkins was able to begin the extraction process immediately, completing it on the same day. (Tr. 71).

Bradley contends that the search warrants became stale, as they were signed on November 29, 2023, yet the searches were not completed until February 16, 2024. (M/Suppress [doc. #46, p. 3]). However, the Court finds this argument unpersuasive. The cell phones had been in the Government's possession since their original seizure from the Charger, and Lambert delivered them to Harkins within ten days of the warrants' issuance. The iPhone 13 Pro Max underwent a complete data extraction within this ten-day period. For the iPhone 11 Pro Max, Harkins began work on extraction immediately, though the process took longer due to the need to unlock the device. The forensic tool ran continuously in the background over the following months until the information was accessible, demonstrating that the Government acted promptly within the technical constraints.

Therefore, even if Bradley had standing to challenge the searches of the two cell phones, the searches would still be valid, as the warrants were executed in a timely manner and were not stale.

### IV.    Arrest of Bradley

"[T]he Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). If an officer has probable cause to arrest a suspect, the officer's lengthy detention of the suspect does not constitute an unreasonable seizure under the

22

Fourth Amendment. *See United States v. Williams*, 124 F. App'x. 885, 887 (5th Cir. 2005); *United States v. Pompa*, 434 F.3d 800, 805 n.3 (5th Cir. 2005).

"Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Scallion v. Norman*, 251 F. App'x. 853, 855 (5th Cir. 2007) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)). The court will look to whether an officer had probable cause for an arrest by examining the events leading up to the arrest, and then decide "'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *D.C. v. Wesby*. 583 U.S. 48, 56-57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Since probable cause deals with probabilities and depends on the totality of the circumstances, it is a "fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It "'requires only a probability or substantial change of criminal activity, not an actual showing of such activity.'" *Wesby*, 583 U.S. at 57 (quoting *Gates*, 462 U.S. at 243-244).

Bradley challenges his arrest on the basis that there was no evidence to show that he had driven the Charger. (Memo in Support of M/Suppress [doc. #33, p. 2]). Further, Bradley contends that there was no basis to detain him. (Post-Hearing Memo [doc. #63, p. 2]). Although Bradley was found in the bed of a truck in the same parking lot as the Charger, officers lacked probable cause to believe that Bradley was trespassing. *Id.* at pp. 2-3. Officers testified that there had been no complaint regarding trespassing, and they did not know if Bradley was authorized to be on that property. *Id.* at p. 3.

Bradley was found hiding in the bed of a pickup truck parked on commercial, private property.  (Memo in Support of M/Suppress [doc. #33, p. 1-2]; Opp. to M/Suppress [doc. #35, p. 8]).  Bradley's presence on the property alone was sufficient to create probable cause for criminal trespass.  Additionally, the surrounding circumstances further supported probable cause for his arrest. MPD officers were actively searching for a dark-colored Charger in relation to a rolling shootout.  They discovered a dark-colored vehicle with bullet holes, identified as the Charger, parked near the pickup truck where Bradley was hiding.  Bradley's proximity to this vehicle and his seeming attempt to elude the authorities by hiding constitute circumstances sufficient to create probable cause that Bradley was involved in the rolling shootout.[1]

Accordingly, it is RECOMMENDED that Bradley's motion be DENIED to the extent it challenges his arrest.

### Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the Motions to Suppress [docs. #32, 46] filed by Defendant Isaac Bradley be DENIED.

---

[1] The undersigned notes that both parties have variously described Bradley's encounter as a seizure, arrest, and detainment.  *See* (Memo in Support of M/Suppress [doc. #33, p. 2]; Opp. to M/Suppress [doc. #35, p. 3]; M/Suppress [doc. #46, p. 1]; Opp. to M/Suppress [doc. #48, p. 3]; Post-Hearing Memo [doc. #63, p. 2]; Post-Hearing Memo [doc. #64, p. 11]). Regardless of the terminology used, the standard for a warrantless arrest is the Government's highest burden. "'A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place.'" *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (quoting *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013)).  Reasonable suspicion is a lower threshold than probable cause. *Rucker v. Marshall*, 119 F.4th 395, 400 (5th Cir. 2024). As detailed, the Government demonstrated probable cause to believe Bradley committed an offense and could likewise meet the lesser reasonable suspicion requirement.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 18th day of November, 2024.

_____
KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE